## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **Criminal No.** |
| | : | |
| v. | : | |
| | : | **VIOLATIONS:** |
| | : | |
| | : | **18 U.S.C. § 201** |
| JOHN HAN LEE, | : | **(Bribery of a Public Official)** |
| | : | |
| | : | **18 U.S.C. § 371** |
| Defendant. | : | **(Conspiracy to Commit Bank Fraud)** |
| | : | |
| | : | **18 U.S.C. § 2 (Aiding and Abetting** |
| | : | **and Causing an Act to be Done)** |
| | : | |
| | : | **18 U.S.C. § 982(a)(2)(A) (Criminal** |
| | : | **Forfeiture)** |

## I N F O R M A T I O N

The United States Attorney charges:

### Relevant Entities and Individuals

1.     From in or about October 2008 to in or about January 2009, the defendant, JOHN HAN LEE ("LEE"), was an employee of Unisource Enterprise Inc ("UEI"). In or about January 2009, LEE left UEI and joined Company E. In or about December 2009, LEE left Company E and became the Vice President-Operations of Avenciatech, Inc. ("Avenciatech").

2.     The Program Executive Office Enterprise Information Systems ("PEO EIS") was an organization within the United States Department of the Army ("Army"), which provided infrastructure and information management systems to the Army. The Project Manager, Defense Communications and Army Transmission Systems ("PM DCATS"), was a division of PEO EIS. The Product Management, Installation Information Infrastructure Modernization Program ("PM I3MP"), was another division of PEO EIS.

3.     Public Official C was an Assistant Project Manager for PM DCATS. While employed at PM DCATS, Public Official C was a public official. Until in or about May 2010, Public Official C worked in Seoul, South Korea. From in or about May 2010 until Public Official C's resignation from PM DCATS in April 2012, Public Official C worked in Fort Belvoir, Virginia. In or about June 2010, Public Official C was a Product Director for PMI3MP. Public Official C became a public official in or about July 1990.

4.     While stationed in Seoul, South Korea, Public Official C was the Contracting Officer Technical Representative ("COTR") for a task on a prime contract with the Eighth United States Army, Command and Control C4IT Technical Support Services, prime contract number W15P7T-06-D-E407 (the "Prime Contract").

5.     Young N. Cho, also known as Alex N. Cho ("CHO"), was the Chief Technology Officer of Nova Datacom, LLC ("Nova Datacom"). Nova Datacom was a government contractor that obtained subcontracts to provide services to the Department of the Army, including subcontracts under the Prime Contract. Nova Datacom maintained its corporate headquarters in Sterling, Virginia and, later, in Chantilly, Virginia.

6.     Nick Park, a/k/a Nochol Park ("PARK"), was an employee of Nova Datacom from in or about January 2007 through in or about August 2007. Beginning in or about August 2007, PARK became the co-founder and President of UEI. UEI provided information technology services to the United States Department of the Army through a subcontract under the Prime Contract. UEI maintained its corporate headquarters in Annandale, Virginia.

7.     Company E was a government contractor with offices in Ashburn, Virginia. From in or about January 2009 through in or about February 2010, Company E provided information

2

technology services to the United States Department of the Army through subcontracts under the Prime Contract. Employee E-1 was the President and Chief Executive Officer of Company E. Employee E-2 was the Director, Pacific Rim, Business Development for Company E.

8.      Oh Sung Kwon, a/k/a Thomas Kwon ("KWON"), was the co-founder and Chief Financial Officer of Avenciatech. Avenciatech maintained its corporate headquarters in Annandale, Virginia. Since in or about October 2009, Avenciatech provided information technology services to the United States Department of the Army through subcontracts under the Prime Contract.

9.      Company F was the prime contractor for the Prime Contract. Company F maintained offices in Eatontown, New Jersey.

10.     King Everett Johnson ("JOHNSON") was a former employee of UEI and, later, Company E. JOHNSON was the founder of Integrated Business and Technology Solutions, LLC ("IBATS").

11.     Company G was a government contractor with offices in Bohemia, New York. Since in or about 2008, Company G provided information technology services to the United States Department of the Army, including through subcontracts under the Prime Contract. Employee G-1 was the President and Chief Executive Officer of Company G.

12.     Company J was a government contractor with offices in Seoul, South Korea. Company J obtained subcontracts from Company E and Avenciatech to provide services to the Department of the Army. Employee J-1 was the President and Chief Executive Officer of Company J.

### The Bribery Scheme with UEI

13.     In or about August 2007, PARK and LEE co-founded UEI. PARK and LEE decided to use UEI as a vehicle to obtain government contracts based on their relationships with Public Official C. PARK, Public Official C, and LEE agreed that Public Official C would be a "silent partner" in UEI. PARK also promised to give Public Official C an Audi Q7 automobile. In exchange for Public Official C's ownership interest in UEI and the promise of other things of value, Public Official C agreed to use Public Official C's official position to direct orders from PM DCATS to Company F to be subcontracted to UEI. PARK, Public Official C, and LEE agreed that Public Official C would obtain the benefit of Public Official C's undisclosed ownership interest in UEI after Public Official C left the government.

14.     Beginning in or about August 2008, Public Official C used Public Official C's official position to provide confidential bid information to assist UEI to obtain a subcontract from PM DCATS via Company F. Thereafter, at Public Official C's direction, LEE created an e-mail account and password for Public Official C at UEI. To conceal Public Official C's identity, Public Official C was given the alias "Joseph Lynn" to use as the name of Public Official C's e-mail address at UEI. The password for Public Official C's e-mail address at UEI was "ruinsane." The job title for "Joseph Lynn" at UEI was "PM/Business Development Manager." The purpose of the e-mail account was to facilitate communications between PARK, LEE, and Public Official C concerning confidential bid information.

15.     Public Official C provided confidential bid information to UEI concerning technical specifications and pricing information to assist UEI prepare its bid for a proposed subcontract. For example, on or about September 22, 2008, Public Official C, using the alias Joseph Lynn, sent an

e-mail to PARK and LEE.  In the e-mail, Public Official C stated that Public Official C had spoken to Company F about the Prime Contract and there was "concurrence to do what is necessary to get UEI in place by next week."  Public Official C attached to the e-mail confidential bid information for an upcoming proposal, including a revised Technical Request and a Cost Estimate.  Public Official C stated the following regarding the Cost Estimate for the proposal: "what I used to develop the cost estimate . . . for your reference only."

16.     On or about September 22, 2008, Company F submitted via e-mail to LEE a Statement of Work for the Prime Contract proposal, which was identified as Task number 262-08-001-W15P7T-06-D-E407-0009.  Company F requested that LEE submit a Task Execution Plan and cost information.  To submit UEI's response to Company F for the proposal, Public Official C created UEI's cost proposal.  On or about September 24, 2008, Public Official C, posing as Joseph Lynn, sent the following e-mail to PARK and LEE concerning UEI: "I am full into this.  I am investing my entire future on this.  I really am looking to work side-by-side with you [LEE] and Nick [PARK] at some point and grow this company."

17.     On or about September 30, 2008, Company F awarded the subcontract to UEI.  The amount of the subcontract, including all options, was $1,131,353.20.  The period of performance was from October 1, 2008 through March 28, 2009.  From in or about December 2008 through in or about March 2009, UEI collected approximately $444,862.20 in payments on the subcontract.

18.     While UEI maintained the subcontract, UEI provided things of value to Public Official C in return for Public Official C's official influence, including cellular telephones for Public Official C and multiple members of Public Official C's family.  As arranged with Employee J-1, Company J included the costs of the cellular telephones provided to Public Official C and Public

Official C's family members in invoices submitted by Company J to UEI; UEI, in turn, invoiced the costs to Company F through the Prime Contract.

19.     After Public Official C used Public Official C's official position to direct the subcontract to UEI, PARK and Public Official C had a falling out.  PARK told LEE that the cause of the falling out was Public Official C's demand for more money.  As a result of the falling out, PARK ceased his business relationship with Public Official C and did not deliver the Audi Q7 automobile as promised to Public Official C.

### The Bribery Scheme with Company E

20.     In or around December 2008, Public Official C asked LEE if LEE was aware of potential replacements for UEI on the subcontract.  LEE introduced Company E to Public Official C as a potential replacement for UEI.  Public Official C asked LEE if LEE could "control" Company E, which LEE understood to mean that Public Official C wanted to ensure that Public Official C would receive things of value from Company E in return for awarding the subcontract, just as Public Official C had done with UEI.  Upon LEE's assurance that LEE could control Company E, Public Official C and LEE agreed to replace UEI with Company E on the subcontract.  In exchange for replacing UEI with Company E on the subcontract, LEE promised to provide things of value to Public Official C.

21.     LEE discussed Company E replacing UEI on the subcontract with Employee E-1 and Employee E-2.  Employees E-1 and E-2 expressed interest in having Company E replace UEI on the subcontract.  LEE explained to Employees E-1 and E-2 that Company E would have to provide things of value to Public Official C to obtain and retain the subcontract, including a new car and

$200,000-$250,000 in cash.  Company E agreed to provide things of value to Public Official C in exchange for obtaining the subcontract and potentially obtaining other government contracts.

22.     In or about January 2009, as directed by Public Official C, Company F awarded to Company E subcontract number W15P7T-06-D-E407.  The subcontract was to provide help desk services and two technical advisors for the United States 8th Army in Korea, which was the same subcontract UEI had been performing.  Thereafter, LEE became an employee of Company E and continued his work on the subcontract.  While employed by Company E, Company E directed LEE to keep Public Official C "happy" such that Company E would obtain and retain government contracts.

23.     During Company E's tenure on the subcontract, Company E provided Public Official C with things of value, including golf outings, hotel stays, meals, and entertainment.  In addition, as arranged with Employee J-1, Company J included the costs of cellular telephones provided to Public Official C and Public Official C's family members in invoices submitted by Company J to Company E; Company E, in turn, invoiced the costs for the cellular telephones to Company F through the Prime Contract.

24.     On or about January 16, 2009, based upon assurances from LEE and Company E that Company E would pay for a new car, Public Official C ordered a new 2009 Lexus ES350 automobile at a cost of approximately $35,000.

25.     In or around February 2009, Employee E-2 asked LEE if Company E could use a credit card to pay for the 2009 Lexus ES350 ordered by Public Official C.  On or about February 11, 2009, LEE sent an email to Employees E-1 and E-2 informing them that the credit card purchase for the 2009 Lexus ES350 ordered by Public Official C was a "NO GO."  LEE further informed

Employees E-1 and E-2 that payment for the car was due the next day and provided them with the bank information for the payment. In response, on or about February 13, 2009, Employee E-2 told LEE that Employee E-2 would contact the Lexus salesperson directly.

26.     On or about February 17, 2009, LEE and Employee J-1 discussed LEE's need to pay for the Lexus ES350 ordered by Public Official C. During the discussion, Employee J-1 agreed to pay the cost of the Lexus ES350 for Public Official C. LEE initially expected Company E to reimburse Employee J-1 for the funds used to purchase the Lexus ES350 for Public Official C. LEE provided Employee J-1 with the wiring instructions to pay for the Lexus ES 350 for Public Official C.

27.     On or about March 19, 2009, LEE sent an email to Employees E-1 and E-2 from LEE's email account at the Department of the Army. The subject line of the email stated "FW: [Public Official C's] Lexus Payment Confirmation." In the email, Lee stated the following to Employees E-1 and E-2: "Are you planning on paying this? Please let me know, because if you are not then I need to borrow money to survive." LEE attached to the email a series of emails between LEE and a Lexus salesperson. The attached communications confirmed that approximately $35,000 had been paid to purchase a Lexus ES350 for Public Official C.

28.     In response, on March 19, 2009, Employee E-2 stated the following in an email to LEE: "I have no idea what this email is about. Please call me to discuss." LEE replied as follows in an email to Employee E-2 the same day: "This is about Lexus car as it said in the subject line." The same day, LEE sent another email to Employee E-2 and another employee of Company E stating the following:

8

> Not important who thought this Lexus was mine or not, but It [sic] was paid by me and had only one purpose. It was to make someone happy and keeping promise. I am man of word [sic] and expect others to do same. My email from the Army email was to prove the fact that it was paid in full and was for [Public Official C]. Also, if it was paid like you had said last time, then we could have avoid [sic] it. . . .

> BTW: [Employee E-1] had called me last time and told me that [Employee E-1] will take care of this. . . again. I am not sure why this is so hard, can my wife or someone send you invoice for it? It this [sic] would take this long, then I would not have up-front the cost.

29.     Public Official C had the use of the 2009 Lexus ES350 from March 2009 until Public Official C left South Korea in June 2010. In or around June 2010, LEE paid $25,000 to Public Official C for the 2009 Lexus ES350. LEE obtained the $25,000 for the automobile from Employee J-1. Ultimately, Company E never paid for a car for Public Official C.

30.     In or about the summer of 2009, Public Official C began telling LEE that Public Official C was displeased with Company E and that Public Official C wanted to replace Company E on the subcontract.

31.     In or about the fall of 2009, Public Official C claimed that Company E had an organizational conflict of interest on the subcontract, such that Company E needed to be replaced on a portion of the subcontract. As a result, Public Official C split the subcontract into two separate subcontracts. Company E retained one of the subcontracts.

32.     In or about November 2009, Public Official C told LEE that Company F would award the second subcontract to Avenciatech and that LEE would have to establish an employment relationship with Avenciatech.

33.     In or about December 2009, LEE was laid off by Company E.  However, at that time, LEE had already arranged with KWON for a position at Avenciatech.

### The Bribery Scheme Involving IBATS and Company J

34.     In or about March 2009, while LEE and JOHNSON were employed by Company E, JOHNSON used IBATS to make payments to Public Official C.  LEE helped JOHNSON prepare an invoice for IBATS to use to submit to Company E for payment for services purportedly provided by IBATS to Company E.  LEE knew from his discussions with  KWON that the IBATS invoice submitted to Company E was fictitious and that IBATS had not, in fact, provided any services to Company E.  JOHNSON used approximately $40,000 obtained from the IBATS invoice to reimburse KWON for a payment made by KWON to Public Official C.

### The Bribery Scheme Involving Company J

35.     In exchange for Public Official's C influence in obtaining subcontracts for Company J, Company J provided things of value directly to Public Official C, including money, plane tickets, hotel stays, meals, drinks, and prostitutes.  On a couple of occasions, Employee J-1 gave approximately $1,000 in cash to LEE to give to Public Official C.  Upon handing the cash to Public Official C, Public Official C directed LEE not to tell anyone about the cash payment.

### The Bribery Scheme Involving Avenciatech

36.     In or about early 2009, KWON learned from LEE that PARK and UEI were having difficulty fulfilling their subcontract with Company F.  KWON and LEE discussed establishing a company for KWON to obtain government contracts.  KWON knew from LEE and PARK that KWON would have to make payments to Public Official C in exchange for Public Official C directing subcontracts from the Army to Avenciatech.  KWON and LEE agreed that KWON would

offer to Public Official C an ownership interest in Avenciatech, which KWON did during KWON's meeting with Public Official C.   In exchange for Public Official C's ownership interest in Avenciatech, Public Official C agreed to use Public Official C's official position to steer subcontracts from the Army through Company F to Avenciatech.  Ultimately, KWON, LEE, and Public Official C agreed that KWON and Public Official C would each have a 40% ownership interest in Avenciatech, LEE would have a 10% ownership interest in Avenciatech, and 10% would be left in reserve.  KWON and Public Official C agreed that Public Official C would obtain the benefit of Public Official C's undisclosed ownership interest in Avenciatech after Public Official C left the government.

37.     KWON and LEE established e-mail accounts for Public Official C at Avenciatech. To conceal Public Official C's identity, Public Official C was given the aliases "Philip Kim" and "Chris So" to use as the names of Public Official C's e-mail addresses at Avenciatech. The purpose of the e-mail accounts was to facilitate communications between KWON, LEE, and Public Official C.

38.     On or about September 30, 2009, with Public Official C's assistance, Avenciatech obtained a subcontract under the Prime Contract, Purchase Order number S3064-0009, in the initial amount of $366,844.80, with an initial period of performance from September 30, 2009 through January 31, 2010.  Public Official C provided KWON and LEE with confidential bid information to include in the subcontract proposal.  From on or about December 30, 2009 through on or about December 1, 2010, with Public Official C's assistance, the Army approved six Change Orders to Purchase Order number S3064-0009.  The Change Orders required Avenciatech to provide

additional services on the subcontract, which increased the subcontract value to $1,913,059.22, and extended the period of performance until February 26, 2011.

39.     On or about February 11, 2011, Avenciatech obtained a second subcontract under the Prime Contract, Purchase Order number 11-0001055, in the initial amount of $551,093.50, with an initial period of performance from February 11, 2011 through July 11, 2011.  On or about April 21, 2011, the Army approved a Change Order to Purchase Order number 11-0001055 that required Avenciatech to provide additional services under the subcontract, which increased the subcontract value to $1,143.513.05, and extended the period of performance until August 12, 2011.

40.     During Avenciatech's tenures on the subcontracts, Avenciatech provided Public Official with things of value, including the following: payments towards the purchase of a 2010 Lexus LS460 automobile, valued at approximately $69,000; hotel stays, including a trip to the Bahamas; meals; and entertainment.  In addition, in or around 2011, KWON disclosed to LEE that KWON was paying $7,000 per month in cash to Public Official C as part of Public Official C's secret ownership interest in Avenciatech.  KWON subsequently told LEE that KWON ceased making the monthly cash payments because of a pending investigation.

## COUNT I
### (Bribery of a Public Official)

41.     Paragraphs 1 through 40 of this Information are realleged and incorporated by reference as if set out in full.

42.     From in or about August 2008 through in or about October 2011, in a continuing course of conduct, in the District of Columbia and elsewhere, the defendant, JOHN HAN LEE, did directly and indirectly, corruptly give, offer, and promise things of value to public officials, namely

Public Official C, with the intent to influence official acts, to influence Public Official C to commit

and aid in committing, collude in, and allow fraud, and make opportunity for the commission of

fraud on the United States, and to induce Public Official C to do and omit to do acts in violation of

the lawful duty of Public Official C to wit, JOHN HAN LEE gave, offered, and promised things of

value for the personal use of Public Official C for Public Official C directing subcontracts to UEI,

Company E, and Avenciatech, and providing preferential treatment for UEI, Company E, and

Avenciatech.

**(Payment of a Bribe to a Public Official, in Violation of Title 18, United States Code, Sections 2 and 201(b)(1)(A), (B), and (C))**

## COUNT TWO
### (Conspiracy to Commit Bank Fraud)

43.     Paragraph 1 of this Information is realleged and incorporated by reference as if set

out in full.

44.     Company H was a real estate settlement, title, and escrow company with offices in

Annandale, Virginia.  Co-Conspirator 7 ("CC-7") was a settlement agent for Company H.

45.     Company K was a mortgage brokerage with offices in Annandale Virginia.  Co-

Conspirator 8 ("CC-8") was the president of Company K and controlled Company K.  Co-

Conspirator 9 ("CC-9") was an employee of Company K and processed residential loan applications

received by Company K.

46.     Country Wide Home Loans, First Tennessee Bank, and First Savings Mortgage

Company were financial institutions with deposits insured by the Federal Deposit Insurance

Corporation.

47.     These banks, along with other non-bank mortgage companies (collectively referred to as "lenders"), were in the business, among other things, of loaning money to individuals who used their houses to secure the loans.  These loans were to:

a.     purchase a home where the lender loaned a lump sum to pay the seller;

b.     refinance a loan where the lender provided funds to pay off the original loan and, in some cases, pay out additional funds; or

c.     obtain a line of credit (known as a "home equity line of credit") where an individual paid off an original loan and/or took periodic cash advances up to a specified maximum amount of money (with additional funds available to be drawn against the line of credit if the individual paid back some of the borrowed money).

48.     The lenders required persons who borrowed money to purchase residential real estate or who sought to obtain a refinancing or a line of credit (collectively, "buyers") to complete a loan application, which listed the individual's assets and liabilities, including real estate property owned and loans associated with each property.  Lenders relied upon the individual to be truthful in these loan applications.  Lenders would not loan money in excess of the available equity in the property securing the loan because if the individual failed to repay the loan, the lenders' recourse would be to foreclose on the loan, take possession of the property, and resell the property in an attempt to recover as much of the outstanding loan amount as possible.

49.     Buyers could choose to work with a mortgage broker, who advised the buyers about various loan products available from various lenders.  Mortgage brokers did not work for any one lender, but were paid by the lender if the buyer received a mortgage loan from that lender.

14

50.     Company K employed loan officers who met with the buyers and completed loan applications, known as a Uniform Residential Loan Application or Form 1003.  In addition to completing these loan applications, the loan officers collected information from the buyers about their employment, assets, liabilities, and credit history in order to aid the mortgage lender in determining whether the buyers were qualified for a loan and were willing to repay the loan.

51.     In order to approve a mortgage loan, lenders required:

    a.     that the buyers document that they had sufficient monthly income and assets to pay the mortgage and to make the required cash contribution toward the purchase of the property;

    b.     a truthful Uniform Residential Loan Application;

    c.     verification from the buyers' banks confirming that the buyers had cash available to make the mortgage payments; and

    d.     a cash contribution (also known as "cash from borrower") to purchase the property.

52.     Lenders of mortgage loans typically did not lend money for the full purchase price of the property.  Rather, lenders normally made loans for less, and required that the buyers use some of their own funds to purchase the property.  Those down payments gave the lenders assurance that the buyers, with some of their own money invested in the property, had an incentive to remain current on their mortgage payments to avert foreclosure, and that the lenders would be able to recover the full proceeds of the loan in the event of foreclosure.

53.     Loans were processed and settled by title and escrow companies.  It was the job of the title and escrow company to research the public land records filed on the property for liens to determine, among other things, whether the property was pledged as collateral for any other loan.

The title and escrow company would also be responsible for holding the lender's money in escrow, paying out the money according to the lender's directions, and acting as the fiduciary of the lender.

54.     If a loan were approved, the lenders instructed a title company to prepare for a "settlement," that is, a meeting where the buyer and seller signed the Deed (transferring legal title), Note (promise to pay the loan), Deed of Trust (public notice that the property is encumbered with a mortgage), Settlement Statement (an accounting of the disbursement of loan money and a listing of cash due from the buyer, which was commonly referred to as a "HUD-1"), and other documents. The lender provided the settlement agent with instructions on how to secure the bank's interest in the property.

55.     At the settlement, the title company received the loan money from the mortgage lender and the buyer's cash contribution.   Thereafter, the title company paid the costs of the settlement, debts of the property or seller, and any other authorized expenses.

56.     If buyers used their homes as collateral to secure a loan, then as a condition to loaning money, the lenders typically required that all previous loans on the property be paid off and closed by the title and escrow company and that the notice of the debt be removed from the appropriate land records so that there would be no other liens which could take precedence over the lender's lien. The lender would require that a Deed of Trust be signed and filed in the land records.

## The Conspiracy

57.     From in or before 2004 and continuing thereafter through at least 2008, in the District of Columbia and elsewhere, the defendant, JOHN HAN LEE, did unlawfully, willfully, and knowingly conspire, combine, confederate, and agree with other persons both known and unknown to commit offenses against the United States, namely, bank fraud, accomplished by LEE 's engaging

in a scheme to defraud and obtain money and property from financial institutions by means of false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. § 371.

### Goal of the Conspiracy

58.     It was a goal of the conspiracy that defendant LEE and his co-conspirators would defraud lenders of money by obtaining mortgage loans on properties through false loan applications, forged documents, and fraudulent settlements, with such loans generating large cash proceeds for the defendant and others.

### Manner and Means

59.     It was a part of the conspiracy that LEE and others, using Company K, recruited buyers who did not provide the requisite cash at settlement, did not expect to fund the mortgage payments themselves, and did not intend to live in the properties after purchase ("straw buyers").

60.     It was a further part of the conspiracy that LEE and others, using Company K, provided false documentation to the lenders, such as false verifications of deposit, false verifications of employment, and forged Uniform Residential Loan Applications and other documents, causing the lenders to believe that the buyers had the means and the willingness to pay the mortgages.

61.     It was a further part of the conspiracy that LEE and others, using Company K, provided false documentation to the lenders, including Settlement Statements and "title binders," which falsely identified the number of encumbrances on properties and the intent of the buyers to pay off pre-existing encumbrances on properties, causing the lenders to believe that there were no other liens that could take precedence over the lenders' liens.

62.     During the course of the conspiracy, and in the manner described above, LEE was involved in the several fraudulent real estate sales and refinances, with loan amounts for these

properties in excess of $4.8 million. As part of the conspiracy, LEE received approximately $1,237,498, representing the proceeds from the fraudulent real estate transactions.

63. For the properties in which LEE recruited the straw buyer, this person failed to make the monthly mortgage payments, and the homes fell into default and the lenders were forced to foreclose. As detailed below, the aggregate loss to the lenders was approximately $1,231,091:

| Address | Settlement Date | Loan Amount (approximate) | Loss in Foreclosure (Approximate) |
|---------|-----------------|---------------------------|-----------------------------------|
| 1705 Stuart Point Lane Herndon, Virginia | December 27, 2006 | $498,750 | $5,000 |
| 5403 South Hampton Dr. Springfield, Virginia | March 30, 2006 | $408,000 | $70,000 |
| 8362 Sapphire Lakes Court Gainesville, Virginia | November 20, 2006 | $1,225,000 | $543,091 |
| 15509 Tuxedo Lane Gainseville, Virginia | February 17, 2006 | $960,000 | $108,000 |
| 40780 Spectacular Bid Place Leesburg, Virginia | August 13, 2007 | $1,724,756 | $505,000 |

### Overt Acts

64. In furtherance of the conspiracy and to effect the objects thereof, the defendant, JOHN HAN LEE, and other members of the conspiracy committed the following overt acts, among others, in the District of Columbia and elsewhere:

### 2006 Purchase of 40780 Spectacular Bid Place, Leesburg, Virginia

65.     On or about December 19, 2006, LEE arranged for a straw buyer to purchase 40780 Spectacular Bid Place, Leesburg, Virginia, through Company K, using as collateral the property at 40780 Spectacular Bid Place, Leesburg, Virginia, which was encumbered by a first mortgage from Country Wide Home Loans and a second mortgage from First Tennessee Bank. The property was originally owned, on paper, in the name of CC-9's close family member. The straw purchaser was one of LEE's close family members. In completing the loan application, CC-9 provided fraudulent information as to the buyer's income, assets, and intent on using the property as the buyer's primary residence. America's Wholesale Lender approved a first loan of $1,000,000, and a second loan of $335,612.

66.     On or about December 19, 2006, CC-9 and the close family member of CC-9 who was the owner of record for 40780 Spectacular Bid Place, Leesburg, Virginia, executed an Agreement as to the Distribution of Proceeds, which authorized Company H to distribute all of the proceeds of the sale of 40780 Spectacular Bid Place, Leesburg, Virginia, to LEE.

67.     LEE further provided CC-7 with a check in the amount of 165,100.90 at the closing on the property. This check was recorded on the Settlement Statement at the "Cash from Borrower" and represented the down payment for the purchase.

68.     The account from which LEE wrote the check that he gave to CC-7 did not have sufficient funds to cover the amount of the check. CC-7 and LEE agreed that CC-7 would not cash the check prior to the closing, thus fraudulently misrepresenting the amount of money contributed by the buyer of the property.

69.     On or about December 19, 2006, the closing occurred and on or about December 21, 2006, LEE received a wire transfer of funds from Company H in the amount of $271,169, which represented the entire proceeds from the sale.

70.     On or about December 26, 2006, LEE's check in the amount of $165,100.90 was cashed by Company H, after Company H had wired the funds to LEE's account.

### 2007 Purchase of 40780 Spectacular Bid Place, Leesburg, Virginia

71.     On or about August 13, 2007, LEE arranged for a straw buyer to purchase 40780 Spectacular Bid Place, Leesburg, Virginia, through Company K, using as collateral the property at 40780 Spectacular Bid Place, Leesburg, Virginia which was encumbered by first and second mortgages from Country Wide Home Loans. The property was originally owned, on paper, in the name of a close family member of LEE's. The straw purchaser was another one of LEE's close family members. In completing the loan application, CC-9 provided fraudulent information as to the buyer's income, assets, and intent on using the property as the buyer's primary residence. First Savings Mortgage Company approved a first loan in the amount of $1,435,000, and a second loan in the amount of $289,756.

72.     On or about May 15, 2007, LEE further provided CC-7 with a check in the amount of $250,000 prior to the closing on the property. This check was recorded on the Settlement Statement as the "Deposit or earnest money" from the borrower.

73.     On or about August 13, 2007, LEE wrote a second check to Company H in the amount of $84,554. This check was recorded on the Settlement Statement as "Cash from Borrower."

74.     The account from which LEE wrote the checks that he gave to CC-7 did not have sufficient funds to cover the amounts in the checks. CC-7 and LEE agreed that CC-7 would not cash

the checks prior to the closing, thus fraudulently misrepresenting the amount of money contributed by the buyer of the property.

75.     On or about August 13, 2007, the closing occurred and on or about August 14, 2006, LEE received a wire transfer of funds from Company H in the amount of $611,905.95, which represented the entire proceeds from the sale.

76.     On or about December 26, 2006, LEE's checks in the amount of $250,000 and $84,554 were cashed by Company H, after Company H had wired the funds to LEE's account.

77.     The straw buyer recruited by LEE failed to pay the mortgage, and by failing to do so, the bank foreclosed on the mortgage and took the property back, which caused a financial loss to the bank of over $500,000.

**(Conspiracy to Commit Bank Fraud, in Violation of Title 18, United States Code, Section 371)**

## FORFEITURE ALLEGATION

1.     Upon conviction of the offense alleged in Count Two, the defendant shall forfeit to the United States any property constituting, or derived from, proceeds the defendant obtained directly or indirectly, as the result of this offense, pursuant to 18 U.S.C. § 982(a)(2)(A).  The United States will also seek a forfeiture money judgment against the defendant in the amount of $1,231,091.

2.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property that cannot be divided without

difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value

of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 982(a)(2)(A), and Title 21, United States Code, Section 853(p)).**

RONALD C. MACHEN Jr.
United States Attorney
For the District of Columbia

By: _____

MICHAEL K. ATKINSON
D.C. Bar No. 430517
JAMES E. SMITH
D.C. Bar No. 482985
ANTHONY SALER
Assistant United States Attorneys
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, DC  20530
202.252.7817 (Atkinson)
202.252.6976 (Smith)
Michael.Atkinson2@usdoj.gov
James.Smith9@usdoj.gov

DATED: March 14 , 2013

22